**UNITED STATES of America,**

v.

**Rafael MONTILLA.**

**Crim. No. 98–10149–JLT.**

United States District Court,
D. Massachusetts.

April 29, 2004.

of the parties' counsel.

Robert L. Burke, Callan & Burke, P.C., Lowell, MA, for Patricia A. Pearson, Plaintiff.

Rita B. Gylys, Blue Cross/Blue Shield of MA, Inc., Jean M. Kelley, Morrison, Mahoney, & Miller LLP, Boston, MA, for Metropolitan Life Insurance Company, Raytheon Employees' Disability Trust, Defendants.

***MEMORANDUM AND ORDER ON THE MOTION OF THE UNITED STATES OF AMERICA TO DISCHARGE MORTGAGE (# 41)***

COLLINGS, United States Magistrate Judge.

### I. Introduction

The United States Attorney has moved to discharge a mortgage on certain property, the equity of which was pledged to secure the appearance of a criminal defendant, one Rafael Montilla ("Montilla"), who has become, and remains to this day, a fugitive. The government's motion raises grave questions as to the future efficacy in this District of using the pledge of equity in property, as provided in 18 U.S.C. § 3142(c)(B)(xi), as a condition of release which will "...reasonably assure the appearance of the [defendant] as required." 18 U.S.C. § 3142(c).

### II. The Facts

The facts are easily stated. Montilla was arrested on April 13, 1998 on a warrant issued upon the filing of a Complaint. He appeared before the Court on April 14, 1998, at which time the government moved for detention. After several continuances, the detention hearing was held on May 13, 1998. In the interim, an indictment was returned on May 7, 1998 charging Montilla in three counts with possession with intent to distribute cocaine and aiding and abetting the possession in violation of 21 U.S.C. § 846.

After the detention hearing, the Court took the matter under advisement. On May 14, 1998, the Court set Conditions of Release which involved the posting of $50,000 of the equity in the real estate owned by Montilla and his wife, Leonidas Montilla, at 86 Blossom Street, Bradford, Massachusetts, electronic monitoring and the third-party custodianship of Montilla's wife. *See* # 15. As part of the pledge of

the equity, Montilla and his wife executed a deed (which was to have been held in escrow) and a $50,000 mortgage on the property which was recorded in the Essex County registry of Deeds. On May 14, 1998, the Court explained in great detail to both the Montilla and his wife that if Montilla fled or became a fugitive, they would lose $50,000 of the equity in the property. Both Montilla and his wife separately stated that they completely understood that those were the terms of the bond. The defendant was then released.

Seven and a half months later, on March 1, 1999 at 7:21 P.M., Montilla fled the residence and has been a fugitive ever since. A warrant for Montilla's arrest was issued on March 2, 1999, and the warrant remains outstanding. As of today, Montilla's whereabouts are unknown to the Court; he remains a fugitive.

### III. The United States Attorney's Position

On March 5, 1999, the Court issued a Declaration of Forfeiture (# 36) of the bond, and the Court believed, perhaps naively, that the United States Attorney would take steps to secure the $50,000 in equity. Not so. Rather, the United States Attorney has made a deal whereby the government will accept a check for $10,000 from Montilla's wife in exchange for asking the Court to discharge the $50,000 mortgage on the property.

In furtherance of this deal, the United States Attorney filed the instant motion to discharge the mortgage. The memorandum in support of the motion gives no reason for the government's decision to forgo collecting the entire $50,000. In a Supplemental Memorandum filed November 10, 2003, the United States Attorney

implied that the reason for the compromise was that collecting the $50,000 would result in a "hardship" to Montilla's wife. Further, upon inquiry from the Clerk, the United States Attorney reported that no criminal charge would be brought against Montilla for failure to appear because, although a fugitive, Montilla has not failed to appear for a scheduled court appearance, and, therefore, a charge of failure to appear would not lie under the reasoning of the case of *United States v. Fisher*, 137 F.3d 1158 (9th Cir.1998).

### IV. The Consequences of the Government's Position

The government's action completely skews the process by which the Court sets conditions of release. In the instant case, the Court found that the pledge of $50,000 was necessary to assure Montilla's appearance. I would not have released him if the amount pledged was $10,000. Although it turns out that my judgment that the pledge of $50,000 would assure Montilla's appearance was mistaken, the plain fact is that when I set conditions of release which involve the pledge of equity in property, I rely explicitly upon the fact that the defendant knows that if he flees, that equity will be forfeited to the United States. It is that knowledge that (hopefully) acts as the necessary deterrent to flight, and it, in fact, does deter flight in the overwhelming majority of cases.[1] That deterrent would be immeasurably lessened if the United States Attorney only elects to forfeit 20% of the amount of the equity pledged.

As I did with Montilla and his wife, in every case in which the equity in real estate is pledged, I require the defendant and every person who has an ownership

---

1. Although I cannot remember every case in which I have accepted a pledge of real estate as a condition of release, in my twenty-two years on the bench, I have done so in numerous cases, and Montilla's case is the only one which I can recall in which a defendant has fled when the equity in property has been pledged.

interest in the property to appear before me in open court. I painstakingly go over every aspect of the pledge of the equity in real estate and insure that the defendant and any of the owners or part-owners fully understand that if the defendant flees, the equity becomes the property of the United States. I do this for two reasons. The first is that the defendant and any owner or part-owners fully understand what they are doing and the risks they are taking. The second is to make sure the defendant knows what will happen to the property is he or she flees in the hope that the defendant will be deterred from fleeing to avoid those consequences to the owner or part-owners. I insure that what I advise the defendant and the owners is accurate.

Now the deterrent effect on the defendant would be substantially less if, in the interests of full disclosure, I advised the defendant and the owners or part-owners that although the equity in the real estate is subject to forfeiture to the government if the defendant flees, you can hope that the government will not take more than 20% of the amount of equity pledged, as it did in the case of Montilla. I cannot imagine that the government would want me to provide that information. But if the government persists in seeking to discharge mortgages upon the payment of only 20% of the face amount of the mortgage, I will not be honestly able to tell a defendant and owners and part-owners of property of which the equity is pledged to assure appearance that if the defendant flees, the amount pledged will be forfeited by the government. I refuse to engage in putting forth half-truths when making statements in court to defendants and the persons who put up equity in property to assure defendants' appearance.

### V. What to Do?

The Court has given a great deal of thought to this matter. As is obvious, it is highly critical of the stance which the government has taken, but not out of lack of sympathy for the defendant's wife. Losing $50,000 in equity in her property would be a definite hardship. However, hardship almost invariably follows to those who are forced to give up the equity in their real estate when a defendant on whose behalf they had pledged the equity flees. But it is a consequence of which the person pledging the equity is fully aware when they pledge the equity. The person voluntarily takes the risk that if the defendant flees, the consequence of loss of the equity will occur. The person always has the choice to decline to pledge the equity, but if they do pledge it, voluntarily and with full knowledge of the possible consequences, it can hardly be considered unfair that the consequence occurs when the defendant flees.

My criticism of the government's conduct stems from my great concern that about the effect the government's position will have on the efficacy of the pledge of equity in real estate to assure appearance in future cases. If this be the government's policy, the balance the Court has to strike between what is reasonably necessary in order to assure a defendant's appearance will be significantly altered.

However, because the United States Attorney apparently has not thought out the consequences of his actions and assumed that the Court would routinely grant his motion, the defendant's wife has paid the government $10,000.00 and been led into thinking that she had a deal with the government which the government had the power to carry out or which would be carried out in a more or less routine manner. In that respect, the defendant's wife has been dealt with in an unfair manner. Accordingly, I will allow the motion to discharge the mortgage in the instant case because of this circumstance. **However,**

by this Memorandum and Order, the government is put on notice that the Court will not grant such motions in the future, at the very least while the defendant remains a fugitive,[2] absent extreme extraordinary circumstances.

### VI.  Order

It is ORDERED that the Motion of the United States to Discharge Mortgage (# 41) be, and the same hereby is, ALLOWED.

2.  For example, the situation might be considerably different if the defendant is apprehended an hour, or even a day, after he has become a fugitive.